VIDEO PIPELINE, INC., Plaintiff,

v.

BUENA VISTA HOME
ENTERTAINMENT,
INC., Defendant.

Buena Vista Home Entertainment,
Inc., and Miramax Film Corp.,
Counterclaim–Plaintiffs,

v.

Video Pipeline, Inc., Counterclaim–
Defendant.

Civil No. 00–5236 (JBS).

United States District Court,
D. New Jersey.

March 28, 2002.

Gary D. Fry, Paul R. Fitzmaurice, Pelino & Lentz, P.C., Philadelphia, PA, Attorneys for Plaintiff Video Pipeline, Inc.

Gary A. Rosen, Patrick M. Madamba, Jr., Akin, Gump, Strauss, Hauer & Feld, LLP, Philadelphia, PA, Attorneys for Defendant Buena Vista Home Entertainment, Inc.

Douglas J. Katich, Katich, Werse & Petillo, Fair Haven, NJ, and John T. Mitchell, Alan R. Malasky, Seyfarth Shaw, Washington, DC, Attorneys for Amici Curiae Video Software Dealers Association and National Association of Recording Merchandisers, Inc.

Jon A. Baumgarten, Marvin M. Goldstein, Proskauer Rose, LLP, Newark, NJ, Attorneys for Amicus Curiae Motion Picture Association of America, Inc.

## OPINION

SIMANDLE, District Judge.

This case involves the intersection of the motion picture and video retailing industries, and the emerging commercial enterprise of Internet sales. Motion pictures have traditionally been promoted through the use of "trailers," which are short previews of the movies, usually created by the film studios. The same is true of the promotion of home videos of such motion pictures. The motion pictures and the home videos enjoy generous protection under the copyright law. The rise of the Internet as an online location for market transactions has changed the traditional scheme of these exchanges and provides the backdrop for this case.

In the multi-billion dollar home video industry, an increasing amount of sales takes place over the Internet. This case examines the copyright issues that arise when an entity uses the copyrighted motion pictures to make short trailers, which are then made available for money to the entity's clients, which are video retailers, for the viewing by retail customers on the retailers' Internet websites, for the purpose of promoting sales of the copyrighted videos. In this case, the copyright owners seek a preliminary injunction against the entity which creates and sells the unauthorized trailers for their copyrighted home videos.

This matter comes before the Court upon motion by defendant Buena Vista Home Entertainment, Inc. (formerly known as Buena Vista Home Video), and counterclaim-plaintiff Miramax Film Corp. (hereinafter collectively "BVHE" or "defendants") for a preliminary injunction upon their amended counterclaim against plaintiff/counterclaim-defendant Video Pipeline, Inc. Plaintiff Video Pipeline originally brought suit against defendant Buena Vista Home Entertainment, Inc., for a declaratory judgment that plaintiff's use of trailers provided by BVHE in creating its own video clips to be commercially used by Internet video retailers does not constitute copyright infringement under the Copyright Act.

Defendant BVHE, a company that manufactures, distributes, and sells home video versions of copyrighted motion pictures, is the exclusive licensee of Walt Disney Pictures and Television ("Disney") in the home video market, and is the exclusive distributor for counterclaim-plaintiff Miramax Film Corp., in the home video market. Plaintiff Video Pipeline compiles, organizes, and provides previews of home video products to home video wholesalers and retailers. A Master Clip License Agreement entered into between Video Pipeline and BVHE as of November 7, 1988, granted license to Video Pipeline to exhibit certain videos provided by BVHE. After filing the above suit for a declaratory judgment, and after BVHE demanded return for its promotional materials, Video Pipeline began creating previews from movies owned by its customer retailers. Defendant BVHE moved for a preliminary injunction to enjoin Video Pipeline from continuing to create and distribute its own video clips of BVHE's movies.

After BVHE filed this motion for preliminary injunction, a voluntary injunction was put into place until resolution of this motion. This Court granted Video Software Dealers Association, the National Association of Recording Merchandisers, Inc., and the Motion Picture Association of America, Inc., leave to participate and submit briefs in this motion as *amici curiae*. A lengthy hearing was held, receiving evidence and arguments of counsel. For the reasons now discussed, the Court will grant defendant BVHE's motion for a preliminary injunction, pursuant to the following findings of fact and conclusions of law

entered under Rules 52(a) and 65(d), Fed. R.Civ.P.

## BACKGROUND

In this preliminary injunction motion, Buena Vista Home Entertainment, Inc. ("BVHE") seeks to enjoin Video Pipeline from streaming video previews it created out of motion pictures upon which BVHE owns the copyright. BVHE is a wholly-owned, indirect subsidiary of The Walt Disney Company, in the business of manufacturing, distributing, and selling home video versions of copyrighted motion pictures and other entertainment content. (McQueen Cert. ¶ 1.) Since 1987, BVHE has been the exclusive licensee of Walt Disney Pictures and Television for the distribution of its products in the home video market. (McQueen Cert. ¶ 2.) In addition, BVHE is the exclusive distributor for Miramax, also a wholly-owned, indirect subsidiary of The Walt Disney Company, in the home video market. (McQueen Cert. ¶ 3.) Video Pipeline is a company founded in 1985 that compiles and organizes promotional previews from entertainment companies into promotional videos which retailers display in their stores to promote retail sales and rentals. (Horovitz Aff. ¶ 5.) Since 1985, Video Pipeline had provided promotional videos to retailers for in-store use, at times editing the material sent by the movie studios, either because it contained sales and marketing information not intended for customer viewing or because Video Pipeline's retailer clients complained about certain inappropriate previews supplied by studios. (Horovitz Aff. ¶ 5, 6.)

BVHE and Video Pipeline entered into a Master Clip Agreement dated November 7, 1988, by which BVHE granted Video Pipeline permission to use certain videotape promotional previews ("trailers") in compilations to be exhibited in video stores to promote home video sales and rentals. (McQueen Cert. ¶ 4.) Beginning in 1995, home video retailers began using the Internet as a means of marketing home video products. (Horovitz Aff. ¶ 17.) In 1997, Video Pipeline began making the promotional previews available to home video retailers' Internet websites by means of an Internet service comprised of "Video-Pipeline.net" to promote sales and rentals of the home video products. (Horovitz Aff. ¶ 17; McQueen Cert. ¶ 4.) VideoPipeline.net is not a website, but is the network through which retailers' customers can access and stream the previews. (Horovitz Aff. ¶ 18.) These previews can be viewed but cannot be downloaded by Internet users. (Horovitz Aff. ¶ 22.)

In general, retail customers can view the previews while on the retailers' websites by clicking on the "preview" buttons for a particular motion picture, which links them immediately to VideoPipeline.net, which then "streams" the video to the customer. (Hearing Tr. at 102.) "Video Pipeline.com" is Video Pipeline's corporate website that provides information about Video Pipeline's online promotional services for retailers, and no previews are actually shown via that site itself. (Horovitz Aff. 19.) "VideoDetective.com" is another website that uses VideoPipeline.net to allow Internet users to access previews and to link to retail websites by means of a "Shop Now" button. (Horovitz Aff. ¶ 20.) Video Pipeline has approximately 25 agreements with certain retailers, including Yahoo!Shopping, Netflix, TLA, and IMDB/Amazon to provide these services. (Horovitz Aff. ¶ 23.) In providing these services to Internetbased retailers, Video Pipeline charges the retailers "per Mega Byte actually shown to consumers." (Horovitz Aff. ¶ 26.) Thus, Video Pipeline receives its income for this service from the retailers it serves, based upon the units of

time that a retailer's customer is viewing the Video Pipeline previews.

On September 13, 2000, BVHE advised Video Pipeline that it did not have permission to use the studio-supplied trailers on the Internet, nor were they cleared for online use, and requested that the previews of BVHE's motion pictures be removed from the website immediately. (McQueen Cert. ¶ 5.) On October 24, 2000, Video Pipeline filed suit in this Court against BVHE, seeking a declaratory judgment that its use of promotional materials provided by BVHE to Video Pipeline did not violate any of BVHE's rights under federal copyright law or any other law. (McQueen Cert. ¶ 6; Original Compl. at 1.) BVHE subsequently terminated the Master Clip License Agreement and demanded return of all trailers previously provided to Video Pipeline. (McQueen Cert. ¶ 6.) On December 21, 2000, Video Pipeline returned to BVHE 80 promotional previews subject to the Master Clip License Agreement. (Horovitz Aff. ¶ 29; McQueen Cert. ¶ 6.)

Video Pipeline removed the previews subject to the agreement from the Internet at BVHE's request, but continued to make its own previews (hereinafter "clip previews") from copies of videos of BVHE's copyrighted motion pictures owned by its retailer clients, with the exception of one clip preview of the Belgian movie "Everybody Famous," which was made from material provided directly by BVHE. (Horovitz Aff. ¶ 30.) Each clip preview created by Video Pipeline is approximately 120 seconds in length and consist of an opening display of the Disney or Miramax trademark, the title of the motion picture being distributed by BVHE, then two or more scenes from the motion picture, followed by another display of the title. (McQueen Cert. ¶ 11; Horovitz Aff. ¶ 32.) In addition, Video Pipeline's clip previews have no voice over, no editing, no use of additional music, and no use or narration or other types of marketing techniques often found in studio-produced trailers. (Hearing Tr. at 19.) At issue are 62 clip previews, including those for movies such as *Fantasia, Beauty and the Beast,* and *Pretty Woman,* for purposes of this preliminary injunction. (Hearing Tr. at 87; McQueen Cert. Ex. H.) It is estimated that Internet users have streamed Video Pipeline's clip previews over 30,000 times between November 3, 2000, and April 3, 2001. (McQueen Cert. ¶ 10.)

BVHE alleges that Video Pipeline's creation, distribution, and provision of online streaming of clip previews to video retailers in this fashion violates § 106 of the Copyright Act. Video Pipeline alleges that its clip previews do not infringe the copyrights on the underlying motion pictures, and that they are in any event protected by the "first sale" doctrine under § 109(a) of the Copyright Act and by the "fair use" doctrine under § 107 of the Copyright Act.

## DISCUSSION

### I. *Preliminary Injunction Standard*

Defendant BVHE moves for a preliminary injunction against Video Pipeline. The standard for injunctive relief in the Third Circuit is well established. In determining whether preliminary injunctive relief is proper, a court considers the following factors: (1) the likelihood of success on the merits; (2) whether the moving party will be irreparably harmed absent such relief; (3) the likelihood of irreparable harm to the nonmoving party; and (4) whether the injunction serves the public interest. *See Adams v. Freedom Forge Corp.,* 204 F.3d 475, 485 (3d Cir.2000) (citing *AT & T v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1427 (3d Cir. 1994), *cert. denied,* 514 U.S. 1103, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995)); *see also*

*Educational Testing Servs. v. Katzman,* 793 F.2d 533, 538 (3d Cir.1986). Here, where defendant BVHE alleges that plaintiff Video Pipeline's acts of creating, distributing, and providing online streaming of clip previews of full-length feature films provided by BVHE, according to their Master Clip License Agreement, constituted a violation of the Copyright Act, the Court considers the likelihood of success on the merits of BVHE's claim for copyright infringement.

### A. *Likelihood of Success on the Merits*

■ BVHE's Amended Counterclaim alleges in part that Video Pipeline engaged in conduct that constitutes copyright infringement under § 106 of the Copyright Act, 17 U.S.C. § 106. Copyright infringement will be established if the plaintiff proves two elements: (1) the plaintiff owns the copyrighted material; and (2) the defendant has engaged in unauthorized "copying" within the meaning of § 106 of the Copyright Act. *Ford Motor Co. v. Summit Motor Prod., Inc.,* 930 F.2d 277, 290–91 (3d Cir.) (citing *Masquerade Novelty, Inc. v. Unique Indus., Inc.,* 912 F.2d 663, 667 (3d Cir.1990), *cert. denied,* 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991); *Whelan Assocs. v. Jaslow Dental Lab.,* 797 F.2d 1222, 1231 (3d Cir.1986)); *see also Educational Testing Servs. v. Katzman,* 793 F.2d at 538. Here, it is uncontested that Disney, BVHE's licensor, owns the copyright of the full-length motion pictures on which Video Pipeline's clip previews are based, as well as the trademarks of the logos of Disney, Buena Vista, Hollywood Pictures, and Touchstone, shown at the beginning of the clip previews. *See* McQueen Cert. ¶¶ 21, 22. To BVHE is thus conferred the exclusive rights reserved as copyright owner under § 106 of the Copyright Act.

### 1. *Exclusive Rights Under § 106 of the Copyright Act*

BVHE argues that Video Pipeline's reproduction of the video clips provided by BVHE infringes all five of the exclusive rights that are reserved to it as owner of the copyright at issue under § 106. *See* 17 U.S.C. § 501(a) ("Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 121 ... is an infringer of the copyright or right of the author."). Section 106 of the Copyright Act provides that the owner of the copyright, subject to sections 107 through 121, has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies ...;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies ... of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of ... motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of ... pictorial ... works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly;....

17 U.S.C. § 106.

Video Pipeline's creation of video clips is most likely a derivative work under § 106(2). *See, e.g., Lamb v. Starks,* 949 F.Supp. 753, 756 (N.D.Cal.1996) (holding that defendant infringed copyright by copying trailer consisting of parts of scenes from plaintiff's movie). Though not binding, the *Lamb* court's analysis of trailers, or movie previews, as a derivative work under § 106 is instructive in this case, which deals specifically with video clips of full-length copyrighted movies. In

*Lamb,* defendant copied plaintiff's trailer of his full-length movie without consent and specially formatted it with other trailers on a compilation video tape to demonstrate on defendant's "3–D" system. The court held that "[t]he trailer clearly is a derivative of the full-length copyrighted movie," relying on the definition of "derivative work" under § 101, which states:

> A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work."

17 U.S.C. § 101.

■ This case similarly deals with clip previews consisting exclusively of scenes taken from full-length copyrighted feature films. Previously, Video Pipeline had received ready-made trailers of Disney movies that it was then authorized to exhibit in retailer's video stores to promote home video rentals and sales. Here, however, after Video Pipeline returned the studio-made trailers to BVHE due to their disagreement over their Internet display, Video Pipeline then compiled and organized its own clip previews from the copyrighted motion pictures owned by its retailer clients.[1] Video Pipeline provided these previews for a fee to retailers as an online service, so that customers viewing the retailer's website could click on an icon, which would then seamlessly take them to Video Pipeline's website where the clip would be shown. As in the *Lamb* case, the video clips here are based exclusively on the copyrighted motion picture, and its scenes come entirely from BVHE's movies. Plaintiff failing to argue to the contrary, and because the clip previews consist entirely of scenes excerpted from defendant's copyrighted films, the Court finds that plaintiff's clip previews for this Internet use constitute "derivative works" under § 106(2).

■ The Court finds that Video Pipeline's clip previews also constitute a public performance under § 106(4). The Third Circuit has explained that § 106(4) confers upon the copyright owner the exclusive right to perform a copyrighted work publicly and to authorize such performances. *See Columbia Pictures Indus., Inc. v. Aveco, Inc.,* 800 F.2d 59, 61–62 (3d Cir.1986) (holding that video cassette business's rental of rooms for viewing of movies for fee constituted "public performance" under 106(4)). To "perform" a work means "in the case of a motion picture ..., to show its images in any sequence of to make the sounds accompanying it audible." 17 U.S.C. § 101. An individual is performing a work "whenever he does anything by which the work is transmitted, repeated, or made to recur." *Aveco,* 800 F.2d at 62. To perform or display a work "publicly" means

> (1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or
> (2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or

---

1. Video Pipeline asserts that all but one of Video Pipeline's Clip Previews were from materials not provided by BVHE or Miramax, the one exception being a clip preview of the movie "Everybody Famous," which was created from material sent to Video Pipeline by Miramax. Horovitz Aff. ¶¶ 30, 31.

to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

17 U.S.C. § 101.

Customers of plaintiff's retailer clients can access the clip previews provided by plaintiff on the Internet. As each clip preview is accessed, scenes from the copyrighted motion picture are transmitted to the individual computer screens, actual points-of-sale in this case, and this replaying of selected scenes from the movie recurs when another of retailer's customers clicks on the appropriate icon. Because transmission of the clip previews to individual computers occurs when any member of the public selects an icon that redirects him or her to Video Pipeline's website, from which the video clips are then shown, such actions by Video Pipeline constitute a "public performance" under § 106(4). *See also Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 158 (3d Cir.1984) (holding that video store's exhibition of movie videos to patrons for fee in private booths constituted "public performance").

■ In addition, the Court finds that Video Pipeline's service of providing clip previews online constitutes a "public display" that violates the copyright owner's exclusive right "to display the copyrighted work publicly." 17 U.S.C. § 106(5). To "display" a work means "in the case of a motion picture . . ., to show individual images nonsequentially." 17 U.S.C. § 101. Internet transmission of copyrighted photographs constituted a "public display" even though it was limited to subscribers. *See Playboy Enters., Inc. v. Frena*, 839 F.Supp. 1552, 1557 (M.D.Fla.1993), *overruled by statute on other grounds as stated in ALS Scan, Inc. v. RemarQ Cmtys.,*

*Inc.*, 239 F.3d 619, 623 (4th Cir.2001) (holding that website display of copyrighted photographs to internet subscribers was "public display"). Here, Video Pipeline allowed transmission of images of nonsequential scenes from a motion picture to occur over the internet and be made available to all members of the public, not just subscribers as in *Playboy Enterprises.* Thus, Video Pipeline's use of the copyrighted motion pictures allowed the display of its images to occur over the Internet in public and satisfies the definition of "public display."

The Court finds that because Video Pipeline's actions violate the exclusive rights of the copyright owner BVHE, plaintiff has infringed on BVHE's copyright. *See* 17 U.S.C. § 501. The next point of discussion concerns Video Pipeline's contention that, notwithstanding its violations of § 106, it is nevertheless protected by the First Sale Doctrine and the Fair Use Defense.

### 2. *First Sale Doctrine*

■ Video Pipeline argues that its actions of creating its own clip previews from those provided by BVHE and subsequently allowing customers of its retailer clients to view them online is protected by the First Sale Doctrine. The first sale doctrine, codified at 17 U.S.C. § 109(a), prevents the copyright owner from controlling future transfers of a particular copy of a copyrighted work after he has transferred its "material ownership" to another. *Columbia Pictures v. Aveco, Inc.*, 800 F.2d 59, 63–64 (3d Cir.1986) (citing *Columbia Pictures Indus. v. Redd Horne*, 749 F.2d 154, 159 (3d Cir.1984)). Section 109(a) provides

Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized

by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord.

17 U.S.C. § 109(a). "Section 109(a) is an extension of the principle that ownership of the material object is distinct from ownership of the copyright in this material." *Redd Horne,* 749 F.2d at 159 (citing 17 U.S.C. § 202). Under the first sale doctrine, the copyright owner cannot control the future transfer of a particular copy once its material ownership has been transferred. *See Redd Horne,* 749 F.2d at 159 (citations omitted).

Video Pipeline relies on *Quality King Distribs. v. L'anza Research Int'l,* 523 U.S. 135, 118 S.Ct. 1125, 140 L.Ed.2d 254 (1998), for the proposition that from the retailer's right to resell its lawfully purchased copyrighted products must come the retailer's right to advertise and promote sales of the products without the copyright holder's consent. The Supreme Court in *Quality King* involved a California manufacturer that sold its copyrighted hair care products to a Malta distributor, which subsequently sold them to an importer, which imported the products back into the United States to be sold at lower prices than the California manufacturer. The Supreme Court held that the importer was entitled to the first sale defense in the copyright infringement action, stating that "[t]he whole point of the first sale doctrine is that once the copyright owner places the copyrighted item in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution." *Quality King,* 523 U.S. at 152, 118 S.Ct. 1125.

Video Pipeline's reliance on *Quality King* is misplaced because it is not a retailer who has lawfully purchased copies of BVHE's product and therefore entitled to the protection afforded by the first sale doctrine. Rather, its clients, not Video Pipeline, are video retailers who may promote the sales or rentals of the products it has lawfully purchased from BVHE. Video Pipeline, in creating clip previews and providing an online service to its customer retailers, contends that the focus of this first sale analysis should more properly be placed on the actions of the retailers, arguing that the defenses afforded to its retailer customers should be transferred to it.

The Court agrees with BVHE that the actual nature of the relationship between Video Pipeline and its retailer customers is one of licensor and licensee, not one of agency. *See* Horovitz Aff. at Ex. 7. According to the agreement, the retailer customers are allowed access to previews provided by Video Pipeline either for "in-store use and/or internet point-of-sale promotional use." *See id.* Video Pipeline provides no support for the argument that one in a license agreement is entitled to the protection of the first sale doctrine defense that may be afforded to the other party.

That Video Pipeline may not stand in the shoes of its customers in asserting a defense is generally supported by *Princeton Univ. Press v. Michigan Document Servs.,* 99 F.3d 1381, 1389 (6th Cir.1996), *cert. denied,* 520 U.S. 1156, 117 S.Ct. 1336, 137 L.Ed.2d 495 (1997), which rejected defendant copier's argument that its copying for "coursepacks" to be sold to university students would have been considered "non profit educational" if done by the students or professors themselves. The court held that the copy shop was not entitled to the "fair use" defense under 17 U.S.C. § 107(1) because "the copying complained of here was performed on a profit-making basis by a commercial enterprise [and][t]he courts have ... properly rejected attempts by for-profit users to stand in the shoes of their customers making non-

profit or noncommercial uses." *Princeton Press,* 99 F.3d at 1389 (citation omitted). Although the discussion here focuses on the availability of the first sale doctrine to plaintiff, the principles are very similar. Here, the fact that Video Pipeline's retailer customers may advertise their lawfully bought copies of the copyrighted motion pictures does not absolve the fact that Video Pipeline profits from its actions in creating video previews and providing the online service to allow streaming of video previews. Similar to the copy shop in *Princeton Press,* Video Pipeline should not be able to hide behind the lawful actions and privileges extended to its retailer customers who have abided by the Copyright Act. *See also Los Angeles News Serv. v. Tullo,* 973 F.2d 791, 797 (9th Cir.1992) (rejecting fair use defense based on defendants's clients' use for "research, scholarship and private study" because "the ultimate use to which the customer puts the tape is irrelevant").

■■■■ Plaintiff's assertion that it should be entitled, as its retailer customers are, to the privilege of advertising video products, is addressed more appropriately within the confines of subsection (c) of § 109. Section 109(c), formerly subsection (b), provides:

Notwithstanding the provisions of section 106(5), the owner of a particular copy lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to display that copy publicly, either directly or by the projection of no more than one image at a time, to viewers present at the place where the copy is located.

17 U.S.C. § 109(c). Congress stated that this subsection "deals with the scope of the copyright owner's exclusive right to control the public display of a particular 'copy' of a work." H.R.Rep. No. 94–1476, 94th Cong., 2d Sess. 79 (1976). Congress further explained the boundaries of the right granted to owners of a particular copy under § 106(5):

[S]ection [109(c)] takes account of the potentialities of the new communications media, notably television, cable and optical transmission devices, and information storage and retrieval devices, for replacing printed copies with visual images. First of all, the public display of an image of a copyrighted work would not be exempted from copyright control if the copy from which the image was derived were outside the presence of the viewers. In other words, *the display of a visual image of a copyrighted work would be an infringement if the image were transmitted* by any method (by closed or open circuit television, for example, or *by a computer· system* ) from one place to members of the public located elsewhere.

*Id.* Although Congress was discussing the possibility of copyright infringement as it relates to a copy owner, its discussion of copyright infringement occurring as a result of computerized transmission is instructive here nonetheless. Under this provision, Congress intended for copyright infringement to occur when images of a copy of copyrighted work are displayed to members of the public located other than where the copy is located. By providing for this provision, Congress intended "to preserve the traditional privilege of the owner of a copy to display it directly, but to place reasonable restrictions on the ability to display it indirectly in such a way that the copyright owner's market for reproduction and distribution of copies would be affected." *Id.*

In this case, the transmittal of images of BVHE's copyrighted motion pictures to customers of retailer licensees of Video Pipeline, presents a markedly similar sce-

nario envisioned by Congress, and therefore constitutes copyright infringement notwithstanding the retailer's right to display under § 106(5). Congress could have said that the transmission of copyrighted images to customers at a distant point of sale by electronic means is within the zone of use permitted by § 109(c), but it has not done so. Thus, Video Pipeline's argument that it is entitled to the same scope of protection as its customer retailers further fails here due to the probable unavailability of the first sale doctrine defense to retailers who have the right to advertise their copies of copyrighted work, but are displaying images of their copyrighted materials at a distance over the Internet. Accordingly, Video Pipeline is not entitled to the protection of the first sale doctrine as provided in § 109 of the Copyright Act.

### 3. *Fair Use Defense*

 Plaintiff Video Pipeline argues that it is entitled to the fair use defense. Fair use is a judicially-created defense that is now codified at § 107 of the Copyright Act. *See Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 576–77, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994). Congress intended for § 107 "to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way." *Campbell*, 510 U.S. at 577, 114 S.Ct. 1164 (citing H.R.Rep. No. 94–1476, p. 66 (1976)). The fair use defense confers a privilege on people other than the copyright owner, "to use the copyrighted material in a reasonable manner, without his consent, notwithstanding the monopoly granted to the owner." *Marcus v. Rowley*, 695 F.2d 1171, 1174 (9th Cir.1983) (citing *Rosemont Enters., Inc. v. Random House, Inc.*, 366 F.2d 303, 306 (2d Cir.1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967)). The fair use doctrine is "an equitable rule of reason, which permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Stewart v. Abend*, 495 U.S. 207, 236, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990) (internal quotations omitted).

 Section 107 provides, in part, that "[n]otwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching, ... scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. In determining whether the use of a work constitutes fair use, the factors to be considered on a case-by-case analysis include:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

> (2) the nature of the copyrighted work;

> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

> (4) the effect of the use upon the potential market for or value for the copyrighted work.

17 U.S.C. § 107; *see also Campbell*, 510 U.S. at 577, 114 S.Ct. 1164. All factors listed above are "to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578, 114 S.Ct. 1164 (citations omitted). Since fair use is an affirmative defense, the proponent, here the plaintiff, carries the burden of proof in demonstrating fair use. *Campbell*, 510 U.S. at 590, 114 S.Ct. 1164 (citing *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 561, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); H.R.Rep. No. 102–836, p. 3 n. 3 (1992)).

### a. *Purpose and Character of Use*

■ The first factor in a fair use enquiry is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." *Campbell*, 510 U.S. at 578, 114 S.Ct. 1164; 17 U.S.C. § 107. The Supreme Court has stated

> The enquiry here may be guided by the examples given in the preamble to § 107, looking to whether the use is for criticism, or comment, or news reporting, and the like.... The central purpose of this determination is to see ... whether and to what extent the new work is 'transformative.' Although such transformative use is not absolutely necessary for a finding of fair use, the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. Such works lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright, and the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use.

*Campbell*, 510 U.S. at 578, 114 S.Ct. 1164 (internal citations omitted).

■ The commercial or nonprofit educational character of a work is not conclusive, but is a fact to be "weighed along with other[s] in fair use decisions." *Campbell*, 510 U.S. at 585, 114 S.Ct. 1164 (quoting *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 448–49 & n. 32, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984)). The fact that a work is commercial as opposed to nonprofit "is a separate factor that tends to weigh against a finding of fair use," but will not elevate it to hard presumptive significance. *Campbell*, 510 U.S. at 584–85, 114 S.Ct. 1164. "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562, 105 S.Ct. 2218 (citing *Roy Export Co. Establishment v. Columbia Broad. Sys., Inc.*, 503 F.Supp. 1137, 1144 (S.D.N.Y. 1980), aff'd, 672 F.2d 1095 (1982)).

Video Pipeline argues in its post-hearing brief that its use of BVHE's motion pictures "is extraordinarily different from the use for which the footage was originally created." Pl.'s Post–Hearing Br. at 4. Video Pipeline further argues that "the character and purpose of VideoPipeline.net is not to be aesthetic, but to be comprehensive and functional in cataloging data and improving retailers' and consumers' access to previews on the Internet," *id.* at 5, relying on *Kelly v. Arriba Soft Corp.*, 77 F.Supp.2d 1116 (C.D.Cal.1999), which has subsequently been affirmed in part and reversed in part. *Kelly v. Arriba Soft Corp.*, 280 F.3d 934, 948 (9th Cir.2002). The *Kelly* case involved the use by a visual search engine on the Internet of copyrighted photographs. The search engine had displayed the results of a user's query as a "thumbnail" image. By clicking on the "thumbnail" image, the user could then view a large version of the picture within the context of the Arriba web page. The United States Court of Appeals for the Ninth Circuit held that the "thumbnail" image in Arriba's search engine constituted fair use, reasoning that while the use of the images was commercial, "Arriba was neither using [plaintiff's] images to directly promote its web site nor trying to profit by selling [the] images. Instead, [the] images were among thousands of images in Arriba's search engine database." *Id.* at 940–41. As for the transformative nature of the image, the court stated that "the thumbnails were much smaller, lower-resolution images that served an entirely dif-

ferent function than Kelly's original images. . . . Arriba's search engine functions as a tool to help index and improve access to images on the internet and their related web sites." *Id.* at 941. The Ninth Circuit held that Arriba's use of the copyrighted images as thumbnail images in its search engine constituted fair use, finding that the first factor weighed in Arriba's favor. The Ninth Circuit further held that Arriba's display of plaintiff's full-sized images did not constitute fair use, thereby reversing the district court. Under the first factor, the court stated that, unlike the use of images for the thumbnails which acted as a means to access information on the Internet, the images on Arriba's website did not have a purpose different from plaintiff's use of them, and concluded that "Arriba did not add new expression to the images to make them transformative [and] Arriba has not changed the purpose or character of the use of the images." *Id.* at 947.

The case at bar presents a much different situation than that presented in *Arriba*. The clip previews that Video Pipeline provides are formed and created exclusively from excerpts of BVHE's motion pictures. While the copyrighted pictures were significantly reduced to become "thumbnail" images in *Arriba*, nothing new is added or significantly changed to transform the clips here. Furthermore, the previews Video Pipeline provided involved no new creative ingenuity, apart from the snipping and slicing that undoubtedly occurred in selecting the excerpts to be viewed, in order to excerpt about two minutes from a full-length motion picture.

The Court is not persuaded by plaintiff's contention that its use of defendant's motion pictures were "extraordinarily different" than the use for which the motion pictures were created. Plaintiff has created and placed clip previews on its website in order to be streamed by customers of its retailer clients. Such actions have the commercial purpose of advertising and promoting the video sales and rentals of the motion picture from which the excerpts were taken. Although plaintiff emphasizes that it served a functional purpose for its retailer clients, many of whom did not have the resources to create their own video previews,[2] the purpose of plaintiff's video previews are nevertheless to promote the video sales and rentals for profit. Plaintiff charged its retailer clients for providing access to and the streaming of the video previews on a per-megabyte basis. Although plaintiff maintains that the per-megabyte charges are a reflection of its expenses in providing services, the net result is that the longer a customer plays a video clip online, the more plaintiff receives as income from the retailer. Such an arrangement reflects that plaintiff's service is conducted on a for-profit basis. Plaintiff's notation that the total home video retail market is "almost $20 billion annually," Pl.'s Br. at 2, underscores the importance of retailers to corner a part of the video retail market, and therefore the importance of the profit-making aspect that plaintiff would rather downplay to this Court. Plaintiff's participation in creating

---

**2.** Whether Video Pipeline's previews were a necessity to retailers in promoting online video sales and rentals is questionable, considering the plausible alternatives of using still images or promotional previews specifically provided for by the motion picture distributors themselves, or creating a different type of preview clip that does lie within the fair use or first sale exceptions. The Court notes further that the lack of a video preview provided by the motion picture distributor indicates that the retailer would not be at a disadvantage in promoting the video sale or rental, as similarly no other retailer would likely be in possession of a video preview for that particular movie.

and providing its own clip previews, in conjunction with its other services, is nevertheless one part of the multi-billion dollar video retail market, made no less significant by plaintiff's characterization that it only "provide[d] a service to retailers [and] never market[ed] any products." Pl.'s Br. at 11.

Plaintiff further cites *Triangle Publ'ns v. Knight–Ridder Newspapers*, 626 F.2d 1171 (5th Cir.1980), as support for the contention that fair use may be made of the very work being marketed by that retailer. *Triangle Publications* involved a competitor's use of the "TV Guide" logo in its advertisements. The Fifth Circuit noted that comparative advertisements are generally accepted in the advertising industry, and found that the fair use defense was applicable in this case, giving heavy emphasis to the fourth factor of effect of the use upon the potential market for the copyrighted work. As defendant BVHE points out, *Triangle Publications* involved elements of criticism and comment that Video Pipeline's video previews lacked. In other words, Video Pipeline's clip previews do not contain any critical commentary. Furthermore, the use of the "TV Guide" logos were limited to the covers of the magazine. This Court would predict that Video Pipeline's display of only the cover art from the movie video's package, for example, would lie within the fair use defense. That is not the case here.

In this case, under the first factor of purpose and character of use, the lack of transformative character of plaintiff's video previews and the for-profit purpose, for which the video previews were made and subsequently made available online, militate against the applicability of the fair use defense.

b. *Nature of Copyrighted Work*

▪ The second factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586, 114 S.Ct. 1164 (citations omitted). "The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy." *Harper & Row*, 471 U.S. at 563, 105 S.Ct. 2218 (contrasting unpublished memoir with published speech) (citation omitted); *see also Stewart*, 495 U.S. at 237, 110 S.Ct. 1750 ("In general, fair use is more likely to be found in factual works than in fictional works.").

*Stewart* involved the use of a copyrighted fictional magazine story as the basis for a motion picture. The Supreme Court in *Stewart* found that the case "presents a classic example of an unfair use: a commercial use of a fictional story that adversely affects the story owner's adaptation rights." *Stewart*, 495 U.S. at 238, 110 S.Ct. 1750 ("[A]ll four factors point to unfair use."); *see also Harper & Row*, 471 U.S. at 563, 105 S.Ct. 2218 ("[A]pplication of the fair use defense [is] greater ... in the case of factual works than in the case of works of fiction or fantasy.").

This case also involves the use of copyrighted works of fiction, not fantasy. Unlike *Stewart*, Video Pipeline did not create a movie from a copyrighted story; rather, it used excerpts from the fictional motion pictures to create video trailers that in the end served the goal of advertising the movie for its client retailers. As the work here nevertheless involved creative, as opposed to factual, works, this second factor weighs against a finding of fair use. *See also Lamb v. Starks*, 949 F.Supp. 753, 757 (N.D.Cal.1996) (finding that creative nature of 2 minute and 40 second movie trailer made from copyrighted motion picture weighed against finding of fair use).

Because the copyrighted works are of a fictional nature, the facts of this case do not weigh in favor of a fair use defense.

### c. *Amount and Substantiality of Portion Used*

▮ The third factor asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole ... are reasonable in relation to the purpose of the copying." *Campbell,* 510 U.S. at 586, 114 S.Ct. 1164 (internal citations omitted). As the Supreme Court recognized, "the extent of permissible copying varies with the purpose and character of the use." *Id.* at 586–87, 114 S.Ct. 1164 (citing *Sony, supra,* 464 U.S. at 449–50, 104 S.Ct. 774 (home videotaping of entire television program "does not have its ordinary effect of militating against a finding of fair use")).

▮ Plaintiff asserts that it uses a "minimal amount" of the movie, and that it does not use the "heart" of the movies, *see Harper & Row,* 471 U.S. at 565, 105 S.Ct. 2218, that would militate against a finding of applicability of the fair use defense. Here, the length of the clip previews were usually less than two minutes, whereas the length of the actual motion pictures were approximately one and a half hours to two hours. A taking may not be justified merely because the amount used is small in comparison to the work as a whole, however. *See, e.g., Harper & Row,* 471 U.S. at 566, 105 S.Ct. 2218 (300–word verbatim quotation from "heart of the book" containing 200,000 words was substantial); *Meeropol v. Nizer,* 560 F.2d 1061, 1070–71 (2d Cir.1977) (verbatim reprinting of 28 copyrighted letters, representing less than 1% of infringing work, was substantial), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978); *Lamb v. Starks,* 949 F.Supp. 753, 757 (N.D.Cal.1996) (copying of entire 2 minute 40–second trailer of 75–

minute long movie favored finding of substantiality); *Roy Export Co. Establishment of Vaduz, Liechtenstein,* 503 F.Supp. 1137, 1145 (S.D.N.Y.1980) (excerpts of less than 2 minute duration from copyrighted films could be deemed "quantitatively substantial"). In light of this, the clip previews' quantitative aspect must be viewed in conjunction with its qualitative value.

▮ Video Pipeline's clip previews consist of the movie studio logo, for example, "Walt Disney," followed by the title of the home video, perhaps "Snow White," approximately two scenes from the first half of the home video, and the title of the home video again. *See* Horovitz Aff. ¶ 32. A sampling of the clip previews does not demonstrate conclusively whether the excerpts taken reflect the "heart" of the movies, although the Court agrees with BVHE that the scenes, for the most part, were used to provide the potential customer with some idea of the plot of each motion picture, its overall tone, and a glimpse of its leading characters. A viewing of other video previews indicates that some of the previews may not have represented accurately the plot and overall tone of the movie. For example, the video preview of the motion picture *Shanghai Noon* represented the movie as a foreign language film with subtitles, the tone of which could be found similar to the drama *The Last Emperor. See* Hearing Tr. at 23–24. In reality, the movie was an East–meets–West action flick. *See id.;* Horovitz Aff. Ex. 7. Video Pipeline's product consists entirely of scenes from the copyrighted movies, preceded by images of the copyrighted logos. Furthermore, plaintiff relies on the expressive value of each video preview in representing and advertising the copyrighted work to potential customers, whether or not its depiction is accurate. Much as taking passages from the "heart" of a book may be used to demon-

strate the essence of the copyrighted work, see *Harper & Row*, 471 U.S. at 564–65, 105 S.Ct. 2218, so may an aggregation of scenes from a motion picture be a reflection of the general themes and tones which one may expect from viewing the entire movie. Indeed, it is designed and intended to be so, in order to apprise the customer of the overall premise. That the clip previews, composed entirely from scenes from the copyrighted movie, can depict no other readily identifiable piece of work, and are meant to do nothing other than that, weighs against the applicability of the fair use defense under this third factor.

From a merely quantitative standpoint, the use of the small portions of the films weighs neither in favor of nor against a finding of a fair use defense. From a qualitative standpoint, however, because of the plaintiff's reliance on the expressive value of its previews in providing a description of the copyrighted motion pictures to potential customers, Video Pipeline's use of portions of the motion pictures weighs against a finding of the fair use defense.

#### d. *Effect of the Use Upon Potential Market for Copyrighted Work*

The fourth factor in determining fair use is "the effect of the use upon the potential market for or value of the copyrighted work." *Campbell*, 510 U.S. at 590, 114 S.Ct. 1164 (citing 17 U.S.C. § 107(4)). This factor "requires the court to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged by the [alleged infringer] . . . would result in a substantially adverse impact on the potential market' of the original." *Campbell*, 510 U.S. at 590, 114 S.Ct. 1164 (citing Nimmer § 13.05[A][4], p. 13–102.61). The enquiry "must take ac-

count not only of the harm to the original but also of harm to the market for derivative works." *Campbell*, 510 U.S. at 590, 114 S.Ct. 1164 (citing *Harper & Row*, 471 U.S. at 568, 105 S.Ct. 2218 (referring to the rights in the copyrighted work, such as the adaptation and serial rights)). "Fair use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied." *Harper & Row*, 471 U.S. at 566–67, 105 S.Ct. 2218 (quoting 1 Nimmer § 1.10[D], at 1–87).

Under the fourth factor, the Court must determine whether plaintiff's use of the copyrighted work affects or materially impairs the marketability of the copyrighted motion pictures. Defendant BVHE argues that it has the right to determine how, when, and where to market its copyrighted motion pictures. Plaintiff argues in response that its services of providing video previews online only "promote the market." Pl.'s Br. at 28. There is truth to both propositions. While Video Pipeline's creation of movie previews and allowing its availability online is intended to promote the video sales and rentals of the underlying copyrighted motion pictures, there is also the possibility that potential customers will be discouraged from purchasing or renting certain videos due to the depiction of the movie as provided by Video Pipeline's clip previews. As discussed above, the preview from *Shanghai Noon* provides one example where the potential customer would be provided with a depiction of a serious drama, rather than an expected selection of scenes highlighting the movie's action sequences. Moreover, the evidence that Video Pipeline's video previews are low in quality, as mentioned during the hearing held on this matter and observed in some of the actual clips in evidence, also suggests that the market for purchasing or renting the copyrighted motion pictures may be detrimentally affected. While

some customers may attribute such flaws to the lack of ability of a particular computer to stream video previews, it is possible that others would attribute the lower quality to the film itself, and thereby discourage its ultimate purchase. Notwithstanding the possibility that the particular example mentioned above may be an anomaly, it is possible though far from certain that Video Pipeline's use of the copyrighted work in an inferior clip preview will affect the potential market for BVHE's copyrighted movies, specifically the video sales and rental market.

Video Pipeline's service of providing online previews to retailers' customers may also affect the marketability of the copyrighted motion pictures due to the retailers' competition with BVHE in online sales. Video Pipeline has agreements with 25 Internet home video wholesalers and retailers doing business on the Internet, such as Yahoo!Shopping, Netflix, TLA, and IMDB/Amazon, to provide them with promotional previews by means of its "Video-Pipeline.net" service. Horovitz Aff. ¶¶ 17, 23. Both parties concede that BVHE and associated entities, which operate Internet websites of their own where authentic trailers can be viewed, are in competition with home video retailers, some of whom are Video Pipeline's clients. Horovitz Aff. ¶ 38; Def.'s Br. at 22–23. While Video Pipeline's previews may attract customers to its retailers' websites and lead to increased purchasing, as they submit, such purchases would most likely detract from the sales of home videos on BVHE's official website.

It is clear to the Court that the original agreement between BVHE and Video Pipeline in 1988 provided for Video Pipeline's use of previews in retailers' in-store display only, not on the Internet. *See* Horovitz Aff. ¶ 5. That such an agreement did not provide for previews to be viewed in connection with online sales or rentals is telling, considering its possible foresight of the present situation of online competition between BVHE and retailer customers of Video Pipeline. Regardless of the original agreement between Video Pipeline and BVHE, the evidence indicates that the online video sales market is a multi-million, if not multi-billion, dollar industry. *See* Horovitz Aff. ¶ 13 ("[T]he total home video products retail market is almost $20 billion annually."); Kohler Aff. ¶ 6 (asserting that TLA Video's sales of home video products online are approximately $6 million annually and account for 30% of the company's annual gross revenue); Pl.'s Br. Ex. C. Video sales of a particular copyrighted motion picture on one retailer's website, with the help of Video Pipeline's promotional clips, would most certainly detract from possible video sales on BVHE's own Internet site.

On the other hand, the market for the copyrighted films may well be enhanced by Video Pipeline's clip previews, because they tend to promote the films to a broadened market of potential customers who find their way to the retailers' websites, and who might otherwise be unaware of, or unattracted to, the retail films. There is no evidence, one way or the other, of whether Video Pipeline's clip previews increase overall sales of the copyrighted works. Under the fourth factor, the Court finds that Video Pipeline's previews have a potentially detrimental effect upon the market for the copyrighted works, but they also have a potentially beneficial effect since they are geared to promote sales of the copyrighted works, and this weighs neither for nor against the applicability of the fair use defense.

Video Pipeline argues that the infringing work, here the clip previews, has minimal effect on the market, primarily because they don't usurp the market for the origi-

nal, citing *On Davis v. The Gap, Inc.*, 246 F.3d 152, 175 (2d Cir.2001), and because there is no market for previews alone, citing *Meeropol v. Nizer*, 560 F.2d 1061, 1069–70 (2d Cir.1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978). The *On Davis* case involved an international retailer's use of a designer's copyrighted eyeglasses in its commercials. The Second Circuit held that the infringement was not a fair use, indicating under the fourth factor that the designer suffered market harm through his loss of royalty. Video Pipeline's literal reliance on the requirement that the use "usurp the market for the original" is misplaced. Here, the Second Circuit went on to explain that usurpation occurs "when the secondary uses harms the market for, or value of, the original." *On Davis*, 246 F.3d at 175. In the case at bar, it is likely that the previews Video Pipeline provides for its retailer customers may harm the market for the copyrighted motion picture, either due to the quality of the previews or because of its flawed representations.

Video Pipeline's reliance on *Meeropol* is also misplaced. The Second Circuit stated here that "[i]f the effect on the market by an infringing work is minimal, for example, far greater use may be privileged than where the market value of the copyrighted material is substantially decreased." *Meeropol*, 560 F.2d at 1069–70. The Second Circuit's statement does not mean that it relies solely on the effect of the market *of* an infringing work, but rather the *effect* of an infringing work on the market of a copyrighted work, explaining that "[a] key issue in fair use cases is whether the defendant's work tends to diminish or prejudice the potential sale of plaintiff's work." *Id.* at 1070. The Court's focus here in looking at the effect of Video Pipeline's previews on the video sale and rental market for the underlying copyrighted motion pictures is thus appropriate.

Video Pipeline's contention that it has no obligation to present evidence showing lack of harm also is not supported by the case it cites, *Leibovitz v. Paramount Pictures, Corp.*, 137 F.3d 109, 116 n. 6 (2d Cir.1998) (finding that balance of four factors favors fair use defense). *Leibovitz* involved an advertisement that parodied a copyrighted photograph of a well-known and widely published photographer. Under the fourth factor, the Second Circuit stated that Leibovitz "all but concedes that the . . . photograph did not interfere with any potential market for her photograph or for derivative works based upon it." *Leibovitz*, 137 F.3d at 116. In a situation where Leibovitz had not identified any market for a derivative work that might be harmed by the ad, the Second Circuit did not require a showing by defendants of lack of harm in a market for derivative works by defendant. *Id.* at 116 n. 6. Here, BVHE has similarly set forth no argument that any market for a derivative work may be harmed by the Video Pipeline's services, a market for a derivative use being one that creators of original works would develop or license others to develop, *see Campbell*, 510 U.S. at 592, 114 S.Ct. 1164. Rather, BVHE asserts that the video sales market for the original underlying copyrighted movie is being detrimentally harmed by Video Pipeline's streaming of clip previews. While Video Pipeline is correct in that it has no obligation to present evidence showing lack of harm in the market for trailers, whether one indeed exists or not, it does have an obligation to present evidence showing lack of harm in the market for the original copyrighted works. As discussed above, there is evidence demonstrating that retailer clients of Video Pipeline competed with BVHE in the online video sales market. However, it can be deduced that a Video Pipeline clip preview of a BVHE

movie marketed through the websites of two dozen Video Pipeline clients will tend to make the product more available to customers and increase overall sales, compared with the lack of such outlets. Upon the present record, the projected market loss or gain is equivocal, and the fourth factor is neutral.

Considering the four factors used in determining the applicability of the fair use defense, the Court finds that the first and third factors significantly weigh against the applicability of the fair use defense, while the second factor only slightly weighs against its applicability, and the fourth is neutral. Under the aggregate of these factors, the Court finds that Video Pipeline will not be entitled to the defense of fair use.

The Court finds that defendant BVHE has demonstrated, and plaintiff Video Pipeline has not refuted, that Video Pipeline has infringed upon BVHE's copyrighted motion pictures in creating and providing video previews online to be accessed by its retailer clients' customers. Video Pipeline has not demonstrated that it is not liable for copyright infringement due to the first sale doctrine under § 109 or the fair use defense under § 107. Accordingly, BVHE has demonstrated a *prima facie* case of copyright infringement, and has established a likelihood of success on the merits under the first prong of the preliminary injunction inquiry.[3]

B. *Irreparable Harm to the Moving Party*

BVHE asserts that it is being irreparably harmed by the continuing acts of BVHE's infringement. A copyright owner who establishes a prima facie case

of infringement "is entitled to a preliminary injunction without a detailed showing of irreparable harm." *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1254 (3d Cir.1983) (citing 3 Nimmer on Copyright § 14.06[A], at 14–50 & n. 16 (collecting authorities)), *cert. dismissed*, 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984). The Third Circuit states that the "prevailing view [is] that a showing of a prima facie case of copyright infringement or reasonable likelihood of success on the merits raises a presumption of irreparable harm." *Apple Computer*, 714 F.2d at 1254 (citing cases). Because BVHE has established a *prima facie* case of copyright infringement, it is entitled to a presumption of irreparable harm, thereby satisfying the second factor in determining whether a preliminary injunction shall issue.

C. *Balancing of the Equities*

Plaintiff Video Pipeline asserts that it will be irreparably harmed if an injunction were to issue, stating that a preliminary injunction would "remove many previews of home video products from retailers who own lawful copies of the home videos and prevent them from effectively marketing them for rental or sale." Pl.'s Br. at 34. A basic purpose behind the balancing of the equities analysis is to ensure that the issuance of an injunction would not harm the infringer more than a denial would harm the movant. *See Opticians Ass'n of America v. Indep. Opticians of America*, 920 F.2d 187, 197 (3d Cir.1990) (citing *ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987)). At issue in this case are approximately 62 clip previews created and provided for online by Video Pipeline, as elucidated in the

---

3. Because defendant establishes a *prima facie* case of copyright infringement and therefore demonstrates a likelihood of success on the merits, BVHE's trademark infringement argument need not be addressed here.

hearing held in this matter. *See* Hearing Tr. at 87:10. Plaintiff argues that an injunction will cause retailers, in need of previews to market their products, to discontinue doing business with Video Pipeline and to utilize services provided by Video Pipeline's competitors.

Whether an injunction will irreparably harm Video Pipeline in this case requires determining the impact of the loss of the 62 clip previews on Video Pipeline's business. Video Pipeline has agreements with approximately 25 Internet retailers to provide their customers with the opportunity to view the promotional clip previews prior to purchasing any video product. Horovitz Aff. ¶ 23. While demonstrating that the 62 clip previews constitute a major portion of the previews that Video Pipeline contains in its catalogue would be significant support for Video Pipeline's argument that it would be driven out of business were an injunction to issue, Video Pipeline provides no such support. Plaintiff's supporting affidavits provide evidence regarding the video sales and rental market in general, and state that Video Pipeline has provided over 1 million promotion videos to retailers and wholesalers since 1985, but does not specify the breakdown into in-store promotional videos and online clip previews, which Video Pipeline began providing in 1997. Without specific information regarding the extensiveness of Video Pipeline's collection of clip previews for Internet use, and the loss that the 62 clip previews represents, it is unknown whether and to what extent Video Pipeline's overall business will be affected by the injunction. Considering, however, that Video Pipeline has provided over 1 million promotional preview videos to retailers and wholesalers since 1985, and thus has provided significant services prior to and unrelated to the services for Internet use, and undoubtedly provides services relating to hundreds if not thousands of titles not originating from BVHE and thus uninvolved here, it is extremely unlikely that the injunction of 62 clip previews will cause the company's demise.

Video Pipeline also argues that the injunction would harm independent retailers who have no resources to make their own movie previews and who must outsource this task to companies like Video Pipeline. As pointed out during the hearing in this matter, there is no third party representing the rights of retailers in this case. While their presence in this case is not necessary to consider the harm that may potentially occur to retailers, the additional arguments and nuances of their position would have painted a more complete picture for this Court. Ultimately, Video Pipeline argues that major distributors, including BVHE and its parent company Disney, are trying to take over the retailing industry of its home videos. Whether this scenario will be played out in the future is unknown. Nevertheless, it is not this Court's duty to manage the course of the video retail market economy. If an injunction were to issue, it is true that a retailer may consequently have limited discretion in creating its advertising vehicles to promote its BVHE products, for example, by not being allowed to outsource certain video preview-making needs to companies like Video Pipeline. In that case, retailers may have to rely solely on the trailers that BVHE may have provided to all similarly situated retailers, or retailers may have to resort to descriptive narrations of storylines on the Internet, especially if BVHE has not provided any trailers to any retailers. There may be other combinations of images, short clips, criticism, description and creativity that would result in video trailers derived from copyrighted materials that would be within a fair use. The retailer also may be able to create and display in-house ex-

cerpts of copyrighted works to its customers at no cost and for the sole purpose of selling the underlying films within the parameters of the fair use and/or first sale doctrine. Though not ideal, these alternatives nevertheless exist. The present case does not adjudicate the works of any retailer, but rather it examines the clip previews at issue, which have been prepared and distributed for profit by a non-retailer without any significant creative expression being added.

Under the third factor in determining whether a preliminary injunction shall issue, the Court finds that the balancing of the equities does not weigh in Video Pipeline's favor.

### D. *Public Interest*

■ *Amici curiae* Video Software Dealers Association and National Association of Recording Merchandisers argue that the public interest in receiving more knowledge about a movie prior to purchase or rental weighs against movants, citing *Orson, Inc. v. Miramax Film Corp.*, 189 F.3d 377, 384 (3d Cir.1999), *cert. denied*, 529 U.S. 1012, 120 S.Ct. 1286, 146 L.Ed.2d 232 (2000), and *Allied Artists Picture Corp. v. Rhodes*, 679 F.2d 656, 662 (6th Cir.1982). *Orson* and *Allied Artists* commented on the unfair market practices that the Pennsylvania and Ohio statutes regulating motion picture licensing sought to ameliorate, including the marketing of a film prior to its completion and without offering exhibitors a chance to screen the final product. *Orson*, 189 F.3d at 384; *Allied Artists*, 679 F.2d at 662. Unlike *Orson* and *Allied Artists*, customers are not required to purchase a video not having seen it, although they may; neither are they required to watch a clip preview prior to purchasing. The situation in this case does not present the egregious marketing practices disapproved of in those cases. It

is nevertheless understood that increased dissemination of information regarding a film's theme, plot, and characters likely serves the public interest. Enjoining the clip previews from being streamed online, however, will not deprive interested customers from access to comparable information, as such a search would lead to innumerable websites that provide detailed information regarding a particular movie's storyline, as the website for movant undoubtedly does.

■ Video Pipeline also argues that the public interest is not served due to BVHE's misuse of copyright to control retailer marketing and to control information available to consumers, citing *Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942), which first recognized a misuse of patent defense. Copyright misuse has been recognized as a defense derived from patent misuse, as found in *Morton Salt*, in certain jurisdictions. *See Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970, 976–77 (4th Cir.1990); *DSC Comms. Corp. v. DGI Techs., Inc.*, 81 F.3d 597, 601 (5th Cir. 1996); *Practice Mgmt. Info. Corp. v. American Med. Assoc.*, 121 F.3d 516 (9th Cir.), *cert. denied*, 522 U.S. 933, 118 S.Ct. 339, 139 L.Ed.2d 263 (1997); *see also In re Napster Copyright Litig.*, 61 U.S.P.Q.2d 1877, 1887–91, 191 F.Supp.2d 1087 (N.D.Cal.2002). As the Fourth Circuit stated, "The question is ... whether the copyright is being used in a manner violative of the public policy embodied in the grant of a copyright." *Lasercomb*, 911 F.2d at 978. "However, generalized antitrust violations will not suffice." *Napster*, 61 U.S.P.Q. at 1891, at ——. Here, Video Pipeline must establish a "nexus between ... alleged anti-competitive actions and [BVHE's] power over copyrighted material." *Id.* at 1891, at —— (quoting *Orth–O–*

*Vision, Inc. v. Home Box Office,* 474 F.Supp. 672, 686 (S.D.N.Y.1979)).

The *Napster* case dealt with an action brought by major recording companies for copyright infringement against an Internet service that facilitated the downloading of plaintiffs' copyrighted works as "MP3" music files. Napster, the Internet service, alleged two bases for misuse: that the licensing clauses in the agreement with plaintiffs' joint venture in the digital distribution market, MusicNet, were unduly restrictive, and that plaintiffs' practices in entering the market for digital distribution of music were anti-competitive. The *Napster* court did not grant the defense, but allowed further discovery under Rule 56(f), Fed.R.Civ.P., to determine whether it applied. Whereas *Napster* dealt with allegations of a host of anti-competitive behaviors by the recording companies, including retail price squeezes, raising costs through licensing provisions, refusals to deal, and exclusive dealing, such anti-competitive actions are not alleged here such that this Court is compelled to allow further discovery. In addition, *Lasercomb* involved a finding of copyright misuse based on the competitor's overly restrictive language in a licensing agreement for computer software to control competition in computer-assisted die manufacture, an associated industry in which the parties were competing.

Though there are further distinctions with *Napster* and *Lasercomb* to be made, this case does not present a situation in which BVHE is attempting to control competition for an area that is outside the scope of its copyrighted works. Although Video Pipeline advances the argument that BVHE is attempting to control the video retail market, it has not demonstrated how BVHE has engaged in egregious anti-competitive practices, such as overly restrictive clauses in the parties' agreements,

that are outside the bounds of protection granted to it under the Copyright Act. As this Court found above, the clip previews at issue are "derivative works" of BVHE's copyrighted motion pictures, and such derivative works are well within the scope of the copyrighted works at issue. In seeking to enjoin further unauthorized use of Video Pipeline's clip previews, BVHE has not caused the video retail market to be impeded by restrictions that substantially undermine its vitality. As discussed above, a video retailer may be more limited in the ways it uses copyrighted works in its advertising, due to the protections of the copyright law, but its ability to sell and profit from BVHE's copyrighted works remains the same. Integral to the copyright misuse defense is the attempted use of copyright to suppress competition, and the absence of egregious anti-competitive practices that would give rise to a copyright misuse defense precludes its availability here.

Plaintiff Video Pipeline also makes the argument that BVHE's motion for preliminary injunctive relief would restrict the retailers' right of free expression under the First Amendment because truthful, non-misleading speech about products is protected under the First Amendment, and therefore any attempt to restrict such speech must pass strict scrutiny, relying on *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 485, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996). Pl.'s Br. at 6. The Supreme Court has recognized the distinction between ideas, which the First Amendment protects, and the expression of those ideas, which the Copyright Act protects, stating that "First Amendment protections [are] already embodied in the Copyright Act's distinction between copyrightable expression and uncopyrightable facts and ideas...." *Harper & Row,* 471 U.S. at 559–60, 105 S.Ct. 2218 (noting that

"[t]he essential thrust of the First Amendment is to prohibit improper restraints on the voluntary public expression of ideas," and that "copyright ... serve[s] this countervailing First Amendment value"). The Supreme Court agreed with the Second Circuit that "copyright's idea/expression dichotomy 'strike[s] a definitional balance between the First Amendment and the Copyright Act by permitting free communication of facts while still protecting an author's expression.'" *Harper & Row,* 471 U.S. at 556, 105 S.Ct. 2218 (citing *Harper & Row, Publishers, Inc. v. Nation Enters.,* 723 F.2d 195, 203 (2d Cir.1983)). Copyright laws are thus not restrictions on speech, as "copyright laws, of course, protect only the form of expression and not the ideas expressed." *New York Times Co. v. United States,* 403 U.S. 713, 726, 91 S.Ct. 2140, 29 L.Ed.2d 822 n. (1971) (Brennan, J., concurring). Video Pipeline's reliance on *44 Liquormart,* therefore, is misplaced. In that case, where the First Amendment's interaction with the Copyright Act was neither raised nor discussed, the Supreme Court held that Rhode Island's complete statutory ban on advertisements for alcohol abridged speech in violation of the First Amendment. *44 Liquormart,* 517 U.S. at 505–07, 116 S.Ct. 1495, 1516. Its applicability to the case at bar, which deals with forms of expression under the Copyright Act, not the complete statutory ban of certain ideas, is therefore negligible.

▬▬▬ The Court notes that the public interest is also served by upholding the rights of copyright owners, "[o]therwise, the rationale for protecting copyright, that of encouraging creativity, would be undermined." *Apple Computer,* 714 F.2d at 1254. The Third Circuit has explained:

Since Congress has elected to grant certain exclusive rights to the owner of a copyright in a protected work, it is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work.

*Apple Computer,* 714 F.2d at 1254–55 (citing *Klitzner Indus., Inc. v. H.K. James & Co.,* 535 F.Supp. 1249, 1259–60 (E.D.Pa. 1982)). Here, where creative energies, money, and effort were undoubtedly put forth in these endeavors of full-length motion pictures, the public interest favors the protection of copyright, and the concomitant encouragement of individual creativity and ingenuity.

Considering the above four factors in determining whether a preliminary injunction shall issue, this Court finds that the likelihood of success on the merits, irreparable injury, and public interest factors weigh in movant BVHE's favor, with plaintiff Video Pipeline unable to demonstrate any irreparable injury that would result if an injunction were to issue. Accordingly, defendant BVHE's motion for a preliminary injunction will be granted.[4]

*CONCLUSION*

Accordingly, for the reasons discussed above, this Court will grant defendant BVHE's motion for a preliminary injunction. Plaintiff Video Pipeline will be enjoined from providing online streaming of the 62 clip previews at issue, and from creating and aggregating any further clip previews of defendant BVHE's copyrighted motion pictures to be streamed online

---

4. Pursuant to Rule 65(c), Fed.R.Civ.P., the Court requires the movants to post a bond in the amount of $50,000 not later than April 3, 2002, as a condition of this preliminary injunction.

for customers of its retailer clients. The accompanying Order for Preliminary Injunction is entered.

### ORDER FOR PRELIMINARY INJUNCTION

THIS MATTER having come before the Court upon motion for a preliminary injunction by counterclaim-plaintiffs Buena Vista Home Entertainment and Miramax Corp. (collectively "BVHE") against plaintiff/counterclaim-defendant Video Pipeline; and the Court having considered the parties' submissions and the submissions of *amici curiae* Video Software Dealers Association and National Association of Recording Merchandisers, and Motion Picture Association of America; and the Court having held an evidentiary hearing on this matter; and good cause having been shown; and for reasons discussed in the Opinion of today's date constituting the Court's findings of fact and conclusions of law under Rules 52(a) and 65(d), Fed. R.Civ.P.;

IT IS on this 28th day of March, 2002, hereby

ORDERED that defendant BVHE's motion for a preliminary injunction [Docket Item 16–1] shall be, and hereby is, **GRANTED**; and it is

FURTHER ORDERED that plaintiff/counterclaim-defendant Video Pipeline, Inc., shall be, and hereby is, enjoined during the pendency of this action:

a. from creating, producing, or editing promotional previews or videoclip compilations derived from motion pictures or copyrighted material that is produced by, licensed to, owned by, manufactured by or distributed by BVHE or Miramax, including but not limited to the motion pictures and other Copyrighted Material listed in Exhibit G to the Answer to Supplemental and Amended Complaint and Amended Counterclaim; and

b. from reproducing, displaying, distributing, streaming, or performing on the Internet or otherwise, any promotional previews or videoclip compilations derived from the Copyrighted Material which Video Pipeline created, produced or edited itself, or received from any other source other than BVHE or Miramax; and

c. from using or displaying the trademarks "Walt Disney," "Touchstone," "Buena Vista," "Hollywood Pictures," or "Miramax," in connection with any promotional previews or videoclip compilations derived from the Copyrighted Material which Video Pipeline created, produced, or edited itself or received from any source other than BVHE or Miramax; and

IT IS FURTHER ORDERED that Video Pipeline shall within ten (10) days of today's date, remove from all servers and databases any and all copies of any of the above-described promotional previews or videotape compilations derived from the Copyrighted Material which Video Pipeline created, produced, or edited itself or received from any source other than BVHE or Miramax; and

IT IS FURTHER ORDERED that BVHE and Miramax post a bond in the amount of $50,000.00 on or before April 3, 2002, as a condition of the foregoing preliminary injunction.