

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-26-2003

# Video Pipeline Inc v. Buena Vista Home

Precedential or Non-Precedential: Precedential

Docket No. 02-2497P

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Video Pipeline Inc v. Buena Vista Home" (2003). *2003 Decisions.* Paper 308.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/308

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed August 26, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-2497

VIDEO PIPELINE, INC.

v.

BUENA VISTA HOME ENTERTAINMENT, INC.

BUENA VISTA HOME ENTERTAINMENT, INC.;
MIRAMAX FILM CORP.,
Counterclaim-Plaintiffs

v.

VIDEO PIPELINE, INC.,
Counterclaim-Defendant

Video Pipeline, Inc.,
Appellant

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 00-cv-05236)
District Judge: Honorable Jerome B. Simandle

Argued January 21, 2003

Before: BECKER,* NYGAARD, and AMBRO, *Circuit Judges*

(Opinion filed August 26, 2003)

---

* Judge Becker concluded his term as Chief Judge on May 4, 2003.

Paul R. Fitzmaurice, Esquire
 (Argued)
Lisa A. Sabatino, Esquire
Pelino & Lentz
1650 Market Street
One Liberty Place, 32nd Floor
Philadelphia, PA 19103
   *Attorneys for Appellant*

Gary A. Rosen, Esquire (Argued)
Akin, Gump, Strauss, Hauer & Feld
2005 Market Street
One Commerce Square, Suite 2200
Philadelphia, PA 19103
   *Attorney for Appellee*

Jon A. Baumgarten, Esquire
William M. Hart, Esquire
Proskauer Rose LLP
1585 Broadway
New York, NY 10036
   *Attorneys for Amicus Curiae
   Motion Picture Association of
   America, Inc.*

**OPINION OF THE COURT**

AMBRO, *Circuit Judge*:

In this copyright case we review the District Court's entry of a preliminary injunction against Video Pipeline, Inc.'s online display of "clip previews." A "clip preview," as we use the term, is an approximately two-minute segment of a movie, copied without authorization from the film's copyright holder, and used in the same way as an authorized movie "trailer." We reserve the term "trailer" for previews created by the copyright holder of a particular movie (or under the copyright holder's authority).

Video Pipeline challenges the injunction on the ground that its internet use of the clip previews is protected by the fair use doctrine and, alternatively, that appellees Buena

Vista Home Entertainment, Inc. and Miramax Film Corp.[1] may not receive the benefits of copyright protection because they have engaged in copyright misuse. We reject both arguments, and affirm.

## BACKGROUND

Video Pipeline compiles movie trailers onto videotape for home video retailers to display in their stores. To obtain the right to distribute the trailers used in the compilations, Video Pipeline enters into agreements with various entertainment companies. It entered into such an agreement, the Master Clip License Agreement ("License Agreement"), with Disney in 1988, and Disney thereafter provided Video Pipeline with over 500 trailers for its movies.

In 1997, Video Pipeline took its business to the web, where it operates VideoPipeline.net and VideoDetective.com. The company maintains a database accessible from VideoPipeline.net, which contains movie trailers Video Pipeline has received throughout the years. Video Pipeline's internet clients — retail web sites selling home videos — use VideoPipeline.net to display trailers to site visitors. The site visitors access trailers by clicking on a button labeled "preview" for a particular motion picture. The requested trailer is then "streamed" for the visitor to view (because it is streamed the trailer cannot be downloaded to or stored on the visitor's computer). The operators of the web sites from which the trailers are accessed — Video Pipeline's internet clients — pay a fee to have the trailers streamed based on the number of megabytes shown to site visitors. Video Pipeline has agreements to stream trailers with approximately 25 online retailers, including Yahoo!, Amazon, and Best Buy.

As noted, Video Pipeline also operates VideoDetective.com. On this web site, visitors can search

---

1. Buena Vista holds an exclusive license to distribute Miramax and Walt Disney Pictures and Television home videos. Buena Vista, Miramax, and Walt Disney Pictures and Television are subsidiaries of The Walt Disney Co. Because of this connection and for simplicity's sake, we refer to the appellees collectively and individually as "Disney."

for movies by title, actor, scene, genre, *etc.* When a search is entered, the site returns a list of movies and information about them, and allows the user to stream trailers from VideoPipeline.net. In addition to displaying trailers, VideoDetective.com includes a "Shop Now" button to link the user to a web site selling the requested video. Visitors to VideoDetective.com can also win prizes by playing "Can You Name that Movie?" after viewing a trailer on the site.

Video Pipeline included in its online database trailers it received under the License Agreement from Disney. Because the License Agreement did not permit this use, Disney requested that Video Pipeline remove the trailers from the database. It complied with that request.

On October 24, 2000, however, Video Pipeline filed a complaint in the District Court for the District of New Jersey seeking a declaratory judgment that its online use of the trailers did not violate federal copyright law. Disney shortly thereafter terminated the License Agreement.

Video Pipeline decided to replace some of the trailers it had removed at Disney's request from its database. In order to do so, it copied approximately two minutes from each of at least 62 Disney movies to create its own clip previews of the movies. (Again, to distinguish between the previews created under the copyright holder's authority and those created by Video Pipeline, we call the former "trailers" and the latter "clip previews" or "clips." We use the term "previews" generically.)

Video Pipeline stores the clip previews in its database and displays them on the internet in the same way it had displayed the Disney trailers. In content, however, the clip previews differ from the trailers. Each clip preview opens with a display of the Miramax or Disney trademark and the title of the movie, then shows one or two scenes from the first half of the movie, and closes with the title again. Disney's trailers, in contrast, are designed to entice sales from a target market by using techniques such as voice-over, narration, editing, and additional music. Video

Pipeline's clip previews use none of these marketing techniques.[2]

Disney also makes its trailers available online. It displays them on its own web sites in order to attract and to keep users there (a concept called "stickiness") and then takes advantage of the users' presence to advertise and sell other products. Disney has also entered into agreements to link its trailers with other businesses, and, for example, has such a link with the Apple Computer home page.

Video Pipeline amended its complaint to seek a declaratory judgment allowing it to use the clip previews. Disney filed a counterclaim alleging copyright infringement. The District Court entered a preliminary injunction, later revised, prohibiting Video Pipeline from displaying clip previews of Disney films on the internet. *See Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*, 192 F. Supp. 2d 321 (D.N.J. 2002). Video Pipeline appeals.[3]

2. We have reviewed as part of the record several of the clip previews and trailers.

3. The District Court's jurisdiction arose under 28 U.S.C. § 1331 and 28 U.S.C. § 1338. We have jurisdiction over this interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1).

On August 7, 2003, the District Court entered summary judgment in Disney's favor as to various claims and counterclaims, some of which overlap with what is before us. *See Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*, 2003 WL 21811891 (D.N.J. Aug. 7, 2003). The obvious question is whether this appeal is moot. We have concluded, however, that a live controversy remains because the District Court has not entered a final judgment or a permanent injunction in place of the preliminary one and has not otherwise revoked or altered the injunction on appeal. *See generally Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 313-18 (1999).

We are troubled that the attorneys for neither side (the same counsel that came before us) appear to have alerted the District Court to this appeal and instead went forward with motions for summary judgment. We are also concerned by the failure of counsel to notify this Court of the District Court's decision (they still have not done so). The attorneys should have known that the August 7 decision raised a question whether this appeal had become moot — a question for us, not counsel, to decide. By continuing to litigate the case in the District Court after the appeal was taken and by failing to inform either Court of the ongoing actions of the other, counsel risked a needless waste of judicial resources as well as the resources of their clients.

## DISCUSSION

We review for an abuse of discretion the District Court's decision to grant Disney's request for a preliminary injunction. *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir. 2000). Under this standard, questions of law receive *de novo* review, and questions of fact are reviewed for clear error. *Id.*

To obtain a preliminary injunction, a party must show (1) that it is "reasonably likely to succeed on the merits" of its copyright infringement claim and (2) a likelihood that it will suffer irreparable harm if the injunction is denied. *Id.* Other issues to consider if relevant are (3) the likelihood of irreparable harm to the non-moving party and (4) the public interest. *Id.* Video Pipeline presents no arguments for issues (3) and (4), so we shall not discuss them, assuming instead that the District Court correctly held that these factors favored issuing the injunction. We therefore address the first two issues.

### I. Likelihood of Success on the Merits

Subject to the fair use exception discussed below (and other exceptions not relevant here), copyright owners have the exclusive right (1) to reproduce the copyrighted work, (2) to prepare derivative works, (3) to distribute copies, (4) to perform publicly a copyrighted motion picture, and (5) to display publicly the individual images of a copyrighted motion picture. 17 U.S.C. §106. To make out a *prima facie* case of copyright infringement for preliminary injunction purposes, Disney needed to show that the display of the clip previews likely violates any provision of § 106. *See* 17 U.S.C. §§ 501(a), (b).[4] The District Court held that Video Pipeline's clip previews likely infringe Disney's exclusive rights under three of § 106's provisions: subsection (2), concerning derivative works; subsection (4), dealing with public performance of motion pictures; and subsection (5), relating to public display of individual images of a motion picture.

---

4. There is no dispute as to Disney's copyright ownership in the full-length motion pictures at issue.

On appeal, Video Pipeline challenges the District Court's holding that the clip previews likely violate § 106(2), asserting that the clips cannot properly be classified as derivative works. It does not contest the Court's determination as to subsections (4) and (5). Because proof of a violation of any one subsection of § 106 states a case of illegal infringement, the District Court's decision that Disney made a *prima facie* showing of infringement on the basis of subsections (4) and (5) would not be affected by any conclusion we might make as to whether the clip previews are derivative in nature. As Video Pipeline's display of excerpts taken from the copyrighted movies clearly comes within the prohibition on public display of motion pictures, and images from a motion picture, we turn to whether Video Pipeline's use should nonetheless be countenanced on the ground that it falls within the "fair use" doctrine.

### A. Fair Use

Congress's constitutional power to provide for copyright protection "is intended to motivate the creative activity of authors . . . by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984). At times, however, "rigid application of the copyright statute . . . would stifle the very creativity which that law is designed to foster." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994). When that is the case, the fair use doctrine may be implicated.

Congress codified the judicially created "fair use" defense at §107 of the 1976 Copyright Act, which permits a "fair use of a copyrighted work." 17 U.S.C. § 107. A fair use, although not specifically defined by the statute, is one made "for purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or research." *Id.* It is an affirmative defense for which the alleged infringer bears the burden of proof.

In judging the fairness of a particular use, courts must take into account the following non-exhaustive list of factors:

> (1)  the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2)  the nature of the copyrighted work;
>
> (3)  the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4)  the effect of the use upon the potential market for or value of the copyrighted work.

*Id.* The four statutory factors "do not represent a score card that promises victory to the winner of the majority." Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1110 (1990). Rather, each factor is "to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578 (citations omitted). Thus, as we apply copyright law, and the fair use doctrine in particular, we bear in mind its purpose to encourage "creative activity" for the public good. *Sony Corp.*, 464 U.S. at 429.

This focus on copyright's purpose makes relevant a comparison of the copy with the original: where the copier uses none of his own creative activity to transform the original work, holding the fair use doctrine inapplicable will not likely interfere with copyright's goal of encouraging creativity. Thus, in the typical fair use case, the analysis under each statutory factor concentrates on the copy and the original work from which it derives. In this case, however, our analysis of the four statutory factors will take into account where relevant Disney's original full-length films and its trailers. We examine in this way the fairness of the online display of the clip previews because, among other things, the statute directs our attention under factor four to the effect of the allegedly infringing uses on both the potential market for any derivative works (the parties do not dispute that Disney's trailers qualify as derivative works) and the potential market for the originals. *See Campbell*, 510 U.S. at 590.

### 1.  Purpose and Character of the Use

Once again, the first factor requires that we consider "the purpose and character of the use, including whether such

use is of a commercial nature or is for nonprofit educational purposes." § 107(1). The District Court concluded that the purpose and character of Video Pipeline's clip previews weigh against finding fair use. We agree.

If a new work is used commercially rather than for a nonprofit purpose, its use will less likely qualify as fair. *Campbell*, 510 U.S. at 585. As Video Pipeline charges a fee to stream the clip previews, its use of the copies is commercial (as the District Court found).

The commercial nature of the use does not by itself, however, determine whether the purpose and character of the use weigh for or against finding fair use. *Id.* at 583-84. We look as well to any differences in character and purpose between the new use and the original. We consider whether the copy is "transformative" of the work it copied because it "alter[ed] the first with new expression, meaning, or message," or instead "whether the new work merely supersedes the objects of the original creation." *Id.* at 579 (citations and alteration in original omitted).

Video Pipeline asserts that its use of the clip previews substantially transforms the full-length films from which they derive because the clips and the movies have different purposes. According to Video Pipeline, the original works have an aesthetic and entertainment purpose while the clip previews serve only to provide information about the movies to internet users or as advertisements for the company's retail web site clients.[5] To the extent that the character and

---

5. We note that the clip previews do not constitute mere "information" about the movies, as would, for example, a list of the names of the actors starring in a film, or a statement of the rating it received. Were Video Pipeline dealing only in this type of information, the fair use doctrine might not be implicated at all because copyright protection does not include facts and ideas, but only their expression. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 547 (1985); 17 U.S.C. § 102(b). Regardless, the clips are part of — not information about — Disney's expressive creations. *See id.* at 569 ("Any copyright infringer may claim to benefit the public by increasing public access to the copyrighted work.").

purpose of the clip previews and the original full-length films diverge, however, the clips share the same character and purpose as Disney's derivative trailers. Whatever informational or promotional character and purpose the trailers possess, so do the clip previews. Consequently, the clips are likely to "supersede the objects of" Disney's derivatives. *Campbell*, 510 U.S. at 579 (citations omitted).[6] Although the clips are copied from Disney's original rather than its derivative works, it is highly relevant to our inquiry here that the clips will likely serve as substitutes for those derivatives.

Video Pipeline also urges us to take into account the functional character and purpose of the database in which it stores trailers and clip previews, apparently hoping we will discern no significant difference between its database and the internet search engine used in *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003).[7] In *Kelly*, Arriba Soft Corp.'s search engine located images on other web sites in response to a user's request and displayed the results in

---

Additionally, it is not clear to us that the use of a copy — not accompanied by any creative expression on the part of the copier — as an advertisement for the original would qualify as a type of use intended to be recognized by the fair use doctrine. *See Campbell*, 510 U.S. at 578-79 ("The enquiry [under the first factor] may be guided by the examples given in the preamble to § 107, looking to whether the use is for criticism, or comment, or news reporting, and the like . . . ."); *id.* at 585 ("The use, for example, of a copyrighted work to advertise a product, even in a parody, will be entitled to less indulgence under the first factor of the fair use enquiry than the sale of a parody for its own sake, let alone one performed a single time by students in school.").

We need not resolve these issues, however, because (as we conclude in the text) the purpose and character of the use of the clip previews and that of Disney's derivative works — its trailers — are the same.

6. We see little significance in whether the trailers use marketing techniques that the clip previews do not.

7. A database is a discrete collection of data (here, previews) set up for efficient retrieval. By comparison, a search engine refers to a system that locates data (or images, *etc.*) from other web sites; thus, a search engine will retrieve data that is not in the engine operator's control. VideoPipeline.net is a database, not a search engine.

thumbnail-size pictures, with a link that would take the user to the web site on which the image was found. *Id.* at 815. The Court held that the display of the thumbnail images was a fair use. *Id.*

Video Pipeline's database does not, however, serve the same function as did Arriba Soft's search engine. As used with retailers' web sites, VideoPipeline.net does not improve access to authorized previews located on other web sites. Rather, it indexes and displays unauthorized copies of copyrighted works. VideoDetective.com does permit viewers to link to legitimate retailers' web sites, but a link to a legitimate seller of authorized copies does not here, if it ever would, make *prima facie* infringement a fair use.

Finally, we note that Video Pipeline's clip previews — to reiterate, approximately two-minute excerpts of full-length films with movie title and company trademark shown — do not add significantly to Disney's original expression. Video Pipeline itself asserts, and the District Court found, 192 F. Supp. at 337, that the clip previews "involved no new creative ingenuity." The Court did recognize that deciding which scene or scenes to include in a clip preview requires some creative choice. *Id.* But as Video Pipeline disclaims the use of any creative ingenuity, we have no difficulty viewing those decisions as involving creativity only in a theoretical, and most narrow, sense. Hence, it is dubious what "new expression, meaning, or message" Video Pipeline has brought to its copies. *Campbell*, 510 U.S. at 579.

It is useful to compare the clip previews with a movie review, which might also display two-minute segments copied from a film. The movie reviewer does not simply display a scene from the movie under review but as well provides his or her own commentary and criticism. In so doing, the critic may add to the copy sufficient "new expression, message, or meaning" to render the use fair. *Id.* Here, in contrast, the fact that "a substantial portion," indeed almost all, "of the infringing work was copied verbatim from the copyrighted work" with no additional creative activity "reveal[s] a dearth of transformative character or purpose." *Id.* at 587. Consequently, rejecting the fair use defense in this case will not likely "stifle the

very creativity" that the Copyright Clause "is designed to foster." *Id.* at 577.

With this context, the District Court correctly concluded that Video Pipeline's clip previews lack any significant transformative quality. Thus, the commercial nature of the clip previews weighs more strongly against Video Pipeline's use. *Campbell*, 510 U.S. at 580 (If "the alleged infringer merely uses [the original work] to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger."). Given the shared character and purpose of the clip previews and the trailers (so that the clips will likely serve as a substitute for the trailers) and the absence of creative ingenuity in the creation of the clips, the first factor strongly weighs against fair use in this case.

### 2. *Nature of the Copyrighted Work*

The second statutory fair use factor directs courts to consider "the nature of the copyrighted work." § 107(2). "This factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586. Fictional, creative works come closer to this core than do primarily factual works. *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 563 (1985). The Disney movies at issue — including, for example, *Beauty and the Beast*, *Fantasia*, *Pretty Woman*, and *Dead Poet's Society* — are paradigms of creative, non-factual expression. And Disney's trailers share imaginative aspects with the originals.

Video Pipeline argues that this factor nonetheless weighs in its favor because Disney released to the public its movies, if not all of its trailers, prior to Video Pipeline's display of the clip previews.[8] It is true that Disney would have a stronger case against fair use had it not yet made its

---

8. The record does suggest that Video Pipeline streamed over the internet clip previews of some Disney movies not yet released to the public.

movies available for the public's viewing pleasure. *See id.* at 554 ("[T]he unpublished nature of a work is a key . . . factor tending to negate a defense of fair use.") (quoting S. Rep. No. 94-473 at 64 (1975)) (alteration and quotation marks in original omitted).

But the second statutory factor does not necessarily weigh in favor of finding fair use simply because the public already has access to the original work. Rather, that Disney's movies and trailers contain mainly creative expression, not factual material, suggests that the use is not fair regardless of the published or unpublished status of the original. *See e.g., Campbell*, 510 U.S. at 586 (holding that the song *Pretty Woman* fit "within the core of the copyright's protective purposes" because of its creative expression, without considering that the original had already been made available to the public). The District Court therefore properly relied on the creative, non-factual expression involved in Disney's movies and trailers to hold that this factor weighs against the fair use defense.

### 3. Amount and Substantiality of the Work Copied

The third factor requires an analysis of "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." § 107(3). The District Court determined that this factor also weighed in Disney's favor. 192 F. Supp. 2d at 340.

As Video Pipeline points out, its previews excerpt only about two minutes from movies that last one and a half to two hours. Quantitatively then, the portion taken is quite small.

But the third factor "calls for thought not only about the quantity of the materials used, but about their quality and importance, too." *Campbell*, 510 U.S. at 587. The District Court found that the clip previews, "for the most part, were used to provide the potential customer with some idea of the plot of each motion picture, its overall tone, and a glimpse of its leading characters." 192 F. Supp. 2d at 339. Although the plot, tone, and leading characters are, of course, significant aspects of the films, the two-minute "glimpse" provided by the clips is made up only of scenes taken from the first half of the Disney films. Disney has not

claimed, for instance, that any of the clips "give away" the ending of a movie, or ruin other intended surprises for viewers of the full-length films. Moreover, as advertisements, the clip previews are meant to whet the customer's appetite, not to sate it; accordingly, they are not designed to reveal the "heart" of the movies. Simply put, we have no reason to believe that the two-minute clips manage in so brief a time, or even intend, to appropriate the "heart" of the movies. *Compare Harper & Row*, 471 U.S. at 564-55 (weighing this factor against finding fair use because the alleged infringer "took what was essentially the heart of the book").

Because the clip previews copy a relatively small amount of the original full-length films and do not go to the "heart" of the movies, this factor, contrary to the District Court's determination, weighs in favor of finding fair Video Pipeline's display of its clips.

### 4. Effect on Potential Market or Value

Finally, courts should evaluate "the effect of the use upon the potential market for or value of the copyrighted work." § 107(4). The District Court considered the question to be whether Video Pipeline's "use of the copyrighted work affects or materially impairs the marketability of the copyrighted motion pictures," and, finding the evidence equivocal, concluded that the fourth factor weighed neither for nor against finding a likelihood of fair use. 192 F. Supp. 2d at 340, 343.

As mentioned above, this final factor "must take [into] account not only . . . harm to the original but also . . . harm to the market for derivative works." *Campbell*, 510 U.S. at 590. Because the issues pertaining to the potential harm to the market for Disney's derivative trailers are more straightforward, we focus our analysis on this area and do not review the District Court's conclusion as to harm to the market for the original full-length films.[9] It is in this context

---

9. The District Court declined to consider the potential harm to the market for derivatives on the ground that Disney had not argued the issue. Disney did, however, so argue in both its briefs in support of its motion for a preliminary injunction, and it submitted evidence to support those arguments. Video Pipeline also responded in the District Court to the merits of Disney's arguments concerning potential harm to the market for its derivative works. Consequently, Video Pipeline suffers no harm by our addressing this issue.

that we conclude that the fourth factor weighs in Disney's favor.

Video Pipeline argued in the District Court that no market exists, or could exist, for movie previews because no one "ever paid or will ever pay any money merely to see trailers." But in fact retail websites are paying Video Pipeline to display both trailers and clip previews. Moreover, Video Pipeline takes too narrow a view of the harm contemplated by this fourth factor. The statute directs us to consider "the effect of the use upon the . . . *value* of the copyrighted work," not only the effect upon the "market," however narrowly that term is defined. § 107(4); *see also Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1119 (9th Cir. 2000) (drawing such a distinction). And the value "need not be limited to monetary rewards; compensation may take a variety of forms." *Id.*; *see also Sony Corp.*, 464 U.S. at 447 n.28 (stating in a different context that the "copyright law does not require a copyright owner to charge a fee for the use of his works, and . . . the owner of a copyright may well have economic or noneconomic reasons for permitting certain kinds of copying to occur without receiving direct compensation from the copier").

Disney introduced evidence that it has entered an agreement to cross-link its trailers with the Apple Computer home page and that it uses on its own websites "the draw of the availability of authentic trailers to advertise, cross-market and cross-sell other products, and to obtain valuable marketing information from visitors who chose [*sic*] to register at the site or make a purchase there." App. 945; *see also Kelly*, 336 F.3d at 821 ("Kelly's images are related to several potential markets. One purpose of the photographs is to attract internet users to his web site, where he sells advertising space as well as books and travel packages. In addition, Kelly could sell or license his photographs to other web sites or to a stock photo database, which then could offer the images to its customers."). In light of Video Pipeline's commercial use of the clip previews and Disney's use of its trailers as described by the record evidence, we easily conclude that there is a sufficient market for, or other value in, movie

previews such that the use of an infringing work could have a harmful effect cognizable under the fourth factor.

We have already determined that the clip previews lack transformative quality and that, though the clips are copies taken directly from the original full-length films rather than from the trailers, display of the clip previews would substitute for the derivative works. As a result, the clips, if Video Pipeline continues to stream them over the internet, will "serve[ ] as a market replacement" for the trailers, "making it likely that cognizable market harm to the [derivatives] will occur." *Campbell*, 510 U.S. at 591. For instance, web sites wishing to show previews of Disney movies may choose to enter licensing agreements with Video Pipeline rather than Disney, as at least 25 have already done. And internet users searching for previews of Disney films may be drawn by the clip previews to web sites other than Disney's, depriving Disney of the opportunity to advertise and sell other products to those users.[10]

Consequently, " 'unrestricted and widespread conduct of the sort engaged in by [Video Pipeline] . . . would result in a substantially adverse impact on the potential market' for the [derivative works]." *Id.* at 590 (quoting 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 13.05(A)(4) (1993)). We therefore hold that the District Court should have weighed this factor against recognizing the fair use defense in this case.

* * * * *

Three of the four statutory factors indicate that Video Pipeline's internet display of the clip previews will not qualify as a fair use. From our consideration of each of those factors, we cannot conclude that Video Pipeline's online display of its clip previews does anything but "infringe[ ] a work for personal profit." *Harper & Row*, 471 U.S. at 563. The District Court therefore correctly held that Video Pipeline has failed to show that it will likely prevail on its fair use defense.

---

10. Record evidence indicates that clip previews were streamed over the internet more than 30,000 times between November 2000 and April 2001.

## B. Copyright Misuse

Video Pipeline further contends that Disney has misused its copyright and, as a result, should not receive the protection of copyright law. Video Pipeline points to certain licensing agreements that Disney has entered into with three companies and sought to enter into with a number of other companies operating web sites.[11] Each of these licensing agreements provides that Disney, the licensor, will deliver trailers by way of hyperlinks[12] for display on the licensee's web site. The Agreements further state:

> The Website in which the Trailers are used may not be derogatory to or critical of the entertainment industry or of [Disney] (and its officers, directors, agents, employees, affiliates, divisions and subsidiaries) or of any motion picture produced or distributed by [Disney] . . . [or] of the materials from which the Trailers were taken or of any person involved with the production of the Underlying Works. Any breach of this paragraph will render this license null and void and Licensee will be liable to all parties concerned for defamation and copyright infringement, as well as breach of contract . . . .

As Video Pipeline sees it, such licensing agreements seek to use copyright law to suppress criticism and, in so doing, misuse those laws, triggering the copyright misuse doctrine.

Neither the Supreme Court nor this Court has affirmatively recognized the copyright misuse doctrine. *See Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 221 (3d Cir. 2002). There is, however, a well-established patent misuse doctrine, *see, e.g., Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488 (1942); *W.L. Gore & Assocs., Inc. v. Carlisle Corp.*, 529 F.2d 614 (3d Cir. 1976), and, as noted below, other courts of appeals have extended the doctrine to the copyright context.

---

11. The record contains three signed licensing agreements and numerous letters sent by Disney to other companies asking them to sign the same agreement.

12. A hyperlink allows an internet user to connect to another web site.

The misuse doctrine extends from the equitable principle that courts "may appropriately withhold their aid where the plaintiff is using the right asserted contrary to the public interest." *Morton Salt*, 314 U.S. at 492. Misuse is not cause to invalidate the copyright or patent, but instead "precludes its enforcement during the period of misuse." *Practice Management Info. Corp. v. American Med. Assoc.*, 121 F.3d 516, 520 n.9 (9th Cir. 1997) (citing *Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970, 979 n.22 (4th Cir. 1990)). To defend on misuse grounds, the alleged infringer need not be subject to the purported misuse. *Morton Salt*, 314 U.S. at 494 ("It is the adverse effect upon the public interest of a successful infringement suit in conjunction with the patentee's course of conduct which disqualifies him to maintain the suit, regardless of whether the particular defendant has suffered from the misuse of the patent."); *Lasercomb*, 911 F.2d at 979 ("[T]he fact that appellants here were not parties to one of Lasercomb's standard license agreements is inapposite to their copyright misuse defense. The question is whether Lasercomb is using its copyright in a manner contrary to public policy, which question we have answered in the affirmative.").

Misuse often exists where the patent or copyright holder has engaged in some form of anti-competitive behavior. *See, e.g.*, *Morton Salt*, 314 U.S. at 492 (explaining that public policy "forbids the use of the patent to secure an exclusive right or limited monopoly not granted by the Patent Office"); *Practice Management*, 121 F.3d at 521 (finding copyright misuse where license to use copyrighted good prohibited licensee from using competing goods); *Lasercomb*, 911 F.2d at 979 (holding the copyright holder misused its copyright by including in licensing agreements a provision that neither the licensee company nor its officers, employees, *et al.*, could develop competing goods for the term of the agreement, ninety-nine years). More on point, however, is the underlying policy rationale for the misuse doctrine set out in the Constitution's Copyright and Patent Clause: "to promote the Progress of Science and useful Arts." Const. Art. I, § 8, cl. 8; *see also Morton Salt*, 314 U.S. at 494 ("The patentee, like these other holders of an exclusive privilege granted in furtherance of a public policy [trademark and copyright holders], may not claim protection of his grant by

the courts where it is being used to subvert that policy."); *Lasercomb*, 911 F.2d at 978 ("The question is . . . whether the copyright is being used in a manner violative of the public policy embodied in the grant of a copyright."). The "ultimate aim" of copyright law is "to stimulate artistic creativity for the general public good." *Sony Corp.*, 464 U.S. at 432; *see also Eldred v. Ashcroft*, 123 S. Ct. 769, 787 (2003) ("[C]opyright's purpose is to *promote* the creation and publication of free expression.") (emphasis in original). Put simply, our Constitution emphasizes the purpose and value of copyrights and patents. Harm caused by their misuse undermines their usefulness.

Anti-competitive licensing agreements may conflict with the purpose behind a copyright's protection by depriving the public of the would-be competitor's creativity. The fair use doctrine and the refusal to copyright facts and ideas also address applications of copyright protection that would otherwise conflict with a copyright's constitutional goal. *See Eldred*, 123 S. Ct. at 789; *Campbell*, 510 U.S. at 575 & n.5. But it is possible that a copyright holder could leverage its copyright to restrain the creative expression of another without engaging in anti-competitive behavior or implicating the fair use and idea/expression doctrines.[13]

For instance, the concurring opinion, written for a

---

13. *See* Note, *Clarifying the Copyright Misuse Defense: The Role of Antitrust Standards and First Amendment Values*, 104 Harv. L. Rev. 1289, 1304-06 (1991) (advocating application of the copyright misuse defense where "the plaintiff has improperly used its copyright power to restrain free trade in ideas," and explaining: "The copyright misuse defense provides a necessary complement to the idea/expression dichotomy [under which an author's expression may be copyrighted, but an idea may not] and fair use doctrine in vindicating the public interest in the dissemination of ideas. The idea/expression limitation merely restricts the scope of the particular copyright being sued upon, and absent a claim of misuse, it cannot be brought to bear on improper licensing restrictions or other misconduct. As with the misuse defense, fair use doctrine excuses copying that would otherwise be infringement in order to vindicate the copyright policy promoting the diffusion of ideas. Unlike misuse doctrine, however, the fair use inquiry directs courts' attention to the social value of the defendant's conduct rather than the social harm caused by the plaintiff's use of its copyright.").

majority of the judges, in *Rosemont Enters., Inc. v. Random House, Inc.*, 366 F.2d 303 (2d Cir. 1966), concluded that pursuant to the unclean hands doctrine the District Court should not have entered a preliminary injunction against an alleged copyright infringer where the copyright holder sought to use his copyright "to restrict the dissemination of information." *Id.* at 311 (Lumbard, C.J., concurring). In *Rosemont Enters.*, a corporation acting for the publicity-shy Howard Hughes purchased the copyright to an article about Hughes solely to bring an infringement suit to enjoin the publication of a forthcoming biography on Hughes. *Id.* at 313. The concurring opinion reasoned:

> The spirit of the First Amendment applies to the copyright laws at least to the extent that the courts should not tolerate any attempted interference with the public's right to be informed regarding matters of general interest when anyone seeks to use the copyright statute which was designed to protect interests of quite a different nature.

*Id.* at 311; *see also Eldred*, 123 S. Ct. at 790 n.24 ("[I]t is appropriate to construe copyright's internal safeguards to accommodate First Amendment concerns.").

Although *Rosemont Enters.* did not concern an anti-competitive licensing agreement as in the typical misuse case, it focused — as do the misuse cases — on the copyright holder's attempt to disrupt a copyright's goal to increase the store of creative expression for the public good. 366 F.2d at 311 ("It would be contrary to the public interest to permit any man to buy up the copyright to anything written about himself and to use his copyright ownership to restrain other[s] from publishing biographical material concerning him."); *Lasercomb*, 911 F.2d at 978 ("[T]he company is required to forego utilization of the creative abilities of all its officers, directors and employees in the area of [computer assisted design and computer assisted manufacture] die-making software. Of yet greater concern, these creative abilities are withdrawn from the public."). A copyright holder's attempt to restrict expression that is critical of it (or of its copyrighted good, or the industry in which it operates, *etc.*) may, in context, subvert — as do anti-competitive restrictions — a copyright's policy goal to

encourage the creation and dissemination to the public of creative activity.

The licensing agreements in this case do seek to restrict expression by licensing the Disney trailers for use on the internet only so long as the web sites on which the trailers will appear do not derogate Disney, the entertainment industry, *etc.* But we nonetheless cannot conclude on this record that the agreements are likely to interfere with creative expression to such a degree that they affect in any significant way the policy interest in increasing the public store of creative activity. The licensing agreements do not, for instance, interfere with the licensee's opportunity to express such criticism on other web sites or elsewhere. There is no evidence that the public will find it any more difficult to obtain criticism of Disney and its interests, or even that the public is considerably less likely to come across this criticism, if it is not displayed on the same site as the trailers. Moreover, if a critic wishes to comment on Disney's works, the fair use doctrine may be implicated regardless of the existence of the licensing agreements. Finally, copyright law, and the misuse doctrine in particular, should not be interpreted to require Disney, if it licenses its trailers for display on any web sites but its own, to do so willy-nilly regardless of the content displayed with its copyrighted works. Indeed such an application of the misuse doctrine would likely decrease the public's access to Disney's works because it might as a result refuse to license at all online display of its works.

Thus, while we extend the patent misuse doctrine to copyright, and recognize that it might operate beyond its traditional anti-competition context, we hold it inapplicable here. On this record Disney's licensing agreements do not interfere significantly with copyright policy (while holding to the contrary might, in fact, do so). The District Court therefore correctly held that Video Pipeline will not likely succeed on its copyright misuse defense.

## II.  Irreparable Harm

On the basis of Disney's *prima facie* infringement case and its likelihood of success against Video Pipeline's asserted defenses, the District Court presumed Disney

would suffer irreparable injury if a preliminary injunction did not issue. Generally, "a showing of a prima facie case of copyright infringement or reasonable likelihood of success on the merits raises a presumption of irreparable harm." *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1254 (3d Cir. 1983).

When, however, "material peripheral to the [copyright holder's] business has been infringed," we "require a stronger showing of irreparable harm as the [copyright holder's] likelihood of success on the merits wanes." *Marco v. Accent Publ'g Co.*, 969 F.2d 1547, 1553 (3d Cir. 1992). Video Pipeline has likely infringed Disney's movies, which are certainly more than peripheral to its business. Even if we were to consider here (as we did under the fourth fair use factor) that the likely market harm will be to the derivative market for trailers rather than to the market for the full-length features, and that the trailer market may be only peripheral to Disney's business, Disney has shown a strong likelihood of success on the merits, and so need not make a particularly strong showing of irreparable harm.

Regardless, the record indicates that Disney will likely incur incalculable losses from the clip previews' competition with the trailers — especially in terms of internet users' attraction to (and the "stickiness" of) Disney's and others' web sites and the concomitant opportunities for sales and marketing on those sites. Disney will therefore likely suffer irreparable harm if Video Pipeline is not enjoined. Moreover, given the verbatim copying, lack of creative ingenuity, and profit-driven purpose of the clip previews, we have no concern that this case is one in which the creative and expressive goals of copyright law would be served better by denying an injunction. *See Campbell*, 510 U.S. at 578 n.10.

## CONCLUSION

The District Court correctly held that Disney will likely succeed on the merits of its copyright infringement case, given its *prima facie* showing and that Video Pipeline's attempts to defend on fair use and copyright misuse grounds will likely fail. The Court's conclusion as to irreparable harm was also correct. We therefore affirm the

entry of the preliminary injunction prohibiting Video Pipeline from displaying its clip previews on the internet.

A True Copy:
          Teste:

                    *Clerk of the United States Court of Appeals*
                    *for the Third Circuit*